18 F.3d 1034
 62 USLW 2593
 Frank C. SCHOONEJONGEN; Wesley L. Losson; John S. Dunning;
William Martone; William V. Hanzalek; Edward F. Ziek;
Melvin Deblock; Joseph Colquhoun; Joseph Majerscak;
Gerard Abbamont; and Olga Wolsey, on behalf of themselves
and all others similarly situated
v.
CURTISS-WRIGHT CORPORATION, Appellant in No. 92-5695.
Frank C. Schoonejongen, Wesley L. Losson, John S. Dunning,
William Martone, William V. Hanzalek, Edward F. Ziek, Melvin
Deblock, Joseph Colquhoun, Joseph Majerscak, Gerard
Abbamont, and Olga Wolsey, on their own behalf and on behalf
of the class of persons they represent, Appellants in No. 92-5710.
 Nos. 92-5695, 92-5710.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 10, 1993.
Decided March 3, 1994.
Sur Petition for Rehearing March 14, 1994.
 
 Thomas M. Kennedy (Argued), Nicholas F. Lewis, Ira Cure, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, East Rutherford, NJ, for appellees/cross appellants.
 Rosemary Alito (Argued), Stephen F. Payerle, Carpenter, Bennett & Morrissey, Newark, NJ, for appellant/cross appellee.
 ORDER
 IT IS ORDERED that:1. The petition for panel rehearing in No. 92-5695 is granted.
 2. The opinion filed on December 28, 1993, is hereby vacated.
 3. A revised panel opinion is hereby issued in the form attached to this Order.
 4. The pending petition for rehearing before the full court in No. 92-5695 will be acted upon in due course following circulation of the attached amended opinion. This Order is without prejudice to the filing of a petition for rehearing addressed to the new portions of the attached opinion.
 Before: STAPLETON, ROTH and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 This appeal and cross-appeal involve a controversy precipitated by defendant Curtiss-Wright's (CW's) termination of health insurance benefits for former employees who had retired from a plant in Wood-Ridge, New Jersey. The district court found that CW had reserved the right to amend its benefits plan to allow termination of benefits, but that CW had violated ERISA Sec. 402(b)(3), 29 U.S.C. Sec. 1102(b)(3), by failing to include an amendment procedure among the plan's provisions. The court concluded that the lack of an amendment procedure rendered invalid a purported amendment authorizing termination of plaintiffs' benefits. As a result, the district court entered a judgment in excess of $2 million in favor of the plaintiffs' class. It declined, however, to find a non-terminable lifetime right to benefits for the plaintiffs' class. We will affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 The facts are largely undisputed. CW owns a number of industrial plants. One, in Wood-Ridge, New Jersey, opened during World War II and did defense-related work for forty years. Following a period of declining business, this plant closed in late 1983. At that time, CW notified a class of individuals who had retired from the Wood-Ridge plant that their health benefits were being terminated.
 
 
 3
 In 1984, a number of retirees who had their benefits terminated brought this suit as a class action on behalf of "all those retired Wood-Ridge employees who were not members of the bargaining unit represented by the United Auto Workers at the time of their retirement and whose post-retirement medical benefits were terminated or denied on or about December 1, 1983." The complaint alleged that CW's termination of benefits was wrongful and that the plaintiffs had a vested right to retiree health benefits for life. Plaintiffs sought damages as well as declaratory and injunctive relief.
 
 A. The Benefit Program: 1966-82
 
 4
 In 1966, CW established a post-retirement health benefits program for the Wood-Ridge facility. CW was the plan sponsor and administrator of the plan, as well as its sole source of funding. From 1966 to 1983, the benefits were provided by a succession of health insurance plans provided by several different carriers. Each time a plan terminated and a new one was initiated, notice was apparently sent to the plaintiffs.
 
 
 5
 From 1966 through 1970, Liberty Mutual provided the insurance benefits. During this period two booklets were sent to retirees stating that benefits would terminate upon death or "if the Group Policy terminates." From 1971 through 1972, Prudential was the insurance carrier for retiree health benefits. Apparently, little, if anything, was provided during this period in the way of documentation. From 1973 through 1974, Blue Cross/Blue Shield provided benefits and CW sent retirees a letter summarizing those benefits. The letter stated that coverage would terminate upon death or "the date the class of persons of which the retiree is a member ceases to be covered by the program" and also stated that CW "reserves the right to modify, revoke, suspend, change, or terminate the program, in whole or in part." The term "class of persons of which the retiree is a member" was not defined. However, the contract between CW and Blue Cross/Blue Shield included in the classification of employees eligible for benefits: "All full-time salaried non-bargaining exempt and non-exempt Employees retired prior to January 1, 1973" and "All full-time salaried, non-bargaining exempt Employees retired on or after January 1, 1973."
 
 
 6
 In September, 1976, CW established a welfare benefit plan in accordance with the recently enacted ERISA statute. The plan had a written Constitution and Trust Agreement. The Constitution provided in part that "the Company reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the Plan." It also provided that "the Company reserves the right to terminate the Plan established hereby for any reason at any time." The Constitution did not specify any particular benefits but simply incorporated any "plan or plans" CW might "from time to time adopt." Also at that time, CW changed the manner in which it provided benefits: it began to self-insure, at least with respect to the medical-surgical benefits, and contracted with various carriers to administer the program.
 
 
 7
 In accordance with ERISA's requirements, Summary Annual Reports (SARs) were provided to plan participants. Starting in 1979, CW added the following reservation language to these SARs: "The company expects and intends to continue this plan indefinitely, but reserves the right to discontinue or amend it."
 
 
 8
 Plaintiffs claim that from 1976 through 1983, although active employees received Summary Plan Descriptions (SPDs), retirees did not. CW insists that SPDs were sent to retirees. In any event, the 1976 SPD, which was prepared by CW and Prudential and not replaced until 1983, provided in part: "When your employment terminates, or you cease to be a member of a class eligible for insurance under any part of the plan, your insurance under that part of the plan will cease.... Your insurance under the group policy will also terminate upon discontinuance of the group policy." Nothing in the SPD defined "class," although the underlying agreement between CW and Prudential listed sixteen classes of employees including: "14. All full-time exempt retired salaried employees located in the United States" and "15. All full-time Retired Employees ... [who] (ii) are classified as full-time non-bargaining non-exempt employees."
 
 
 9
 A five-page "highlight summary" of exempt retiree benefits, first distributed to exempt retirees in 1973 and revised in 1975 to reflect the change from Blue Shield to Prudential, explained:
 
 Termination of Coverage
 
 10
 A retiree's coverage will terminate on the date of his or her death or on the date the class of persons of which the retiree is a member ceases to be covered by the Program.
 
 
 11
 * * * * * *
 
 
 12
 CURTISS-WRIGHT CORPORATION RESERVES THE RIGHT TO MODIFY, REVOKE, SUSPEND, CHANGE, OR TERMINATE THE PROGRAM IN WHOLE OR IN PART, AT ANY TIME.
 
 
 13
 App. 296-97, 428-29.
 
 B. The Benefit Program: 1982-84
 
 14
 In 1982, CW began adding the following language to all letters, or other documents, involving the benefit plan: "Although the company fully expects to continue this benefit, you should be aware that unlike your retirement benefit which is a vested benefit, the retirement health care coverage is not a guaranteed benefit and therefore is subject to change or termination."
 
 
 15
 In 1983, concurrent with a change in carriers, a new SPD was issued and distributed to active employees. Plaintiffs and CW dispute whether the SPD was distributed to retirees. This SPD stated: "Coverage under this Plan will cease for retirees and their dependents upon the termination of business operations of the facility from which they retired." In addition, it stated: "Although the Company expects this Plan to continue in its present form for an indeterminable period, this Plan is not a vested Plan and as such is subject to modification or termination at any time." CW contends that the provision allowing termination of retiree benefits in the event of a plant closure was intended as a clarification; plaintiffs claim it was an amendment.
 
 
 16
 In November 1983, CW announced that the Wood-Ridge plant would close and that in accordance with the provision in the 1983 SPD, retiree benefits would be cut off for non-bargaining unit employees who retired from the Wood-Ridge plant. This termination of benefits allegedly contradicted oral representations made to many of the retirees that their health benefits would continue for life.[1] The plaintiffs brought this suit in 1984 alleging breach of contract and violations of ERISA.
 
 C. The District Court's Decision
 
 17
 After six years of litigation, the district court issued its decision in 1990 following a bench trial. The court found that CW had reserved the right to amend its plan. In particular, it referred to the express reservation of such a right in the 1976 Plan Constitution, although it noted that other documents also evidenced such a reservation. The district court further found that the term in the 1983 SPD permitting termination of retiree benefits upon closure of the plant at which they had worked was not a clarification of an already existing plan term, but rather was a new term. Accordingly, the district court held that this new term could only be effective if it had been added to the plan as an amendment.
 
 
 18
 The district court observed that, contrary to ERISA Sec. 402(b)(3), 29 U.S.C. Sec. 1102(b)(3), the plan did not specify procedures for amendment of the plan's terms. It further concluded that the manner in which the amendment was added to the plan in this case did not comply with any unpublished amendment procedures. As a result, the district court held that the amendment was invalid. It followed that the termination of plaintiffs' retiree benefits was contrary to the terms of the plan.
 
 
 19
 CW appeals from the district court's judgment against it; plaintiffs cross appeal from its determinations that CW reserved the right to amend the plan and that plaintiffs have no vested health benefits.[2]
 
 II. CURTISS-WRIGHT'S APPEAL
 
 20
 A. Curtiss-Wright's Failure to Provide an Amendment
 
 Procedure
 
 21
 CW insists that: (1) its plan contained an amendment procedure in compliance with ERISA Sec. 402(b)(3) and the 1983 amendment was adopted in accordance with that procedure; and (2) even if there was a violation of ERISA Sec. 402(b)(3), striking a plan term is not an appropriate remedy for a violation of that subsection.
 
 
 22
 1. Was ERISA Sec. 402(b)(3) Violated?
 
 
 23
 The provision of CW's plan relating to amendments is the statement in the Constitution and other documents that "[t]he Company reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the plan." CW contends that this suffices to satisfy the requirements of Sec. 402(b)(3) which provides in part that: "Every employee benefit plan shall-- ... (3) provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan...." 29 U.S.C. Sec. 1102(b)(3) (1988). We disagree.
 
 
 24
 A simple reservation of a right to amend is not the same as a "procedure for amending [the] plan"; nor does it provide a procedure "identifying the persons who have authority to amend the plan." A primary purpose of Sec. 402(b)(3) is to ensure that all interested parties will know how a plan may be altered and who may make such alterations. Only if they know this information will they be able to determine with certainty at any given time exactly what the plan provides. The reservation in the CW plan does not accomplish these objectives, and acceptance of CW's argument would render requirements of Sec. 402(b)(3) essentially meaningless.
 
 
 25
 CW cites Huber v. Casablanca Industries, Inc., 916 F.2d 85 (3d Cir.1990) in support of its position. In Huber, we concluded that a plan provision stating that "the Trustees may amend or modify this plan in whole or in part" specified an acceptable amendment procedure; namely "modification by the Trustees" in a context where amendments had been formally adopted by resolutions at a regularly constituted board meeting in accordance with the established process of the trustees. Id. at 106. CW argues by analogy that there was an acceptable amendment procedure specified here; namely, modification by the Company. Section 402(b)(3) states, however, that the procedure provided by the plan must permit the identification of the persons who have the authority to modify the plan; "the Trustees" clearly identifies the authorized persons, "the Company" does not. An individual reading the Huber plan could recognize the provision in question as describing a specific procedure for amending the plan; here, one is unable to tell what individuals or bodies within the Company could promulgate an effective amendment. Had the CW plan stated that the plan could be modified by the "Board of Directors," rather than "the Company," then Huber might provide an appropriate analogy.[3]
 
 
 26
 We conclude that Huber is distinguishable. We agree with the district court that CW's plan was in violation of Sec. 402(b)(3).[4]
 
 
 27
 2. Does a Violation of Sec. 402(b)(3) Warrant Striking the
 
 
 28
 Purported Amendment?
 
 
 29
 In at least three previous cases, we have noted that a violation of Sec. 402(b)(3) might prevent any purported amendment from taking effect, but we have expressly declined to decide that question. See, e.g., Deibler v. Local Union 23, 973 F.2d 206, 210 n. 7 (3d Cir.1992) ("[A]rguably, ... a plan cannot be amended unless and until an amendment procedure is added to the plan and complied with.") (quoting Frank v. Colt Industries, Inc., 910 F.2d 90, 98 (3d Cir.1990), citing Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163 n. 9 (3d Cir.1990)). This case requires that we now reach that issue.
 
 
 30
 CW argues that the invalidation of the purported amendment due to the failure of CW to comply with Sec. 402(b)(3) would be inconsistent with our decision in Hozier. CW reads Hozier as holding that creation of "a substantive remedy for procedural violations of ERISA would contravene ERISA's statutory scheme" and that "procedural violations do not create rights to benefits in disregard of the plan terms." As a general matter, these propositions make sense. However, they are inapplicable here.
 
 
 31
 Hozier addresses the issue of whether a failure to comply with ERISA's notice or reporting requirements confers a right to receive benefits not provided for in the plan. There is something at stake here far more fundamental than a failure to comply with ERISA's procedural requirements pertaining to reporting and notice. The basic premise of ERISA is that a plan sponsor will be free to determine what benefits the plan will provide, but that once such a determination has been made, the benefits must be described in a written plan that is available to participants at any time upon request. Thereafter the participants are entitled to rely upon the plan document as defining the benefits currently being provided. Unless and until the written plan is altered in a manner, and by a person or persons authorized in the plan, neither the plan administrator nor a court is free to deviate from the terms of the original plan. It is in this way that ERISA provides certainty and protects participants against frustration of their legitimate expectations.
 
 
 32
 Unlike the situation in Hozier where the plaintiffs sought benefits not provided for in the plan, the plaintiffs' right to benefits in this case is derived exclusively from the terms of the plan; all the district court did was enforce the plan as written. The case law expressly recognizes that amendments which are not adopted substantially in accordance with a plan's amendment procedures are ineffective to alter the terms of a plan. See, e.g., Albedyll v. Wisconsin Porcelain Co. Revised Retirement Plan, 947 F.2d 246, 255 (7th Cir.1991); Frank, 910 F.2d at 98 ("Where a plan has complied with ERISA by setting forth a method for accomplishing amendment, of course each putative amendment will be evaluated with reference to that method."). The same result is required where there are no amendment procedures at all. To hold otherwise would place those who violate Sec. 402(b)(3) by including no procedure for amendment in a plan in a better position than those who comply with that requirement and would thereby discourage employers from complying with Sec. 402(b)(3).
 
 
 33
 We therefore hold that the absence of an amendment procedure in CW's plan documents renders invalid its purported 1983 amendment allowing termination of plaintiffs' benefits. Contrary to CW's suggestion that such a holding will "undermine the integrity of the plan documents," we conclude that such a holding is necessary to assure the integrity of those documents.
 
 
 34
 By so holding, we do not suggest that a plan sponsor that reserves a right to amend its plan but neglects to include a provision complying with Sec. 402(b)(3) is forever foreclosed from effectively utilizing its reserved power. The congressional scheme embodied in ERISA will be best served by a rule that an amendment designed solely to bring a plan into compliance with Sec. 402(b)(3) can be effectively adopted by formal action of those who possess the sponsor's final management authority, in the case of CW by formal action of its board of directors. However, unless and until CW's board thus brings its plan into compliance and thereafter a further amendment terminating plaintiffs' benefits is adopted in accordance with the procedures thus designated, plaintiffs are entitled to receive the benefits specified in the plan.[5]
 
 
 35
 B. Curtiss-Wright's Right to Terminate Benefits
 
 
 36
 Alternatively, CW suggests that we should sustain the November 1983 announcement as a termination of its entire welfare benefit plan and the institution of a new plan without benefits for the retirees of the Wood-Ridge plant. It points out that it reserved the right to terminate its plan as well as to amend it and that Sec. 402(b)(3)'s requirement of a plan provision specifying a process for amendments does not apply to plan terminations. Because CW could have terminated its entire plan without implicating Sec. 402(b)(3) and could then have instituted a new plan without benefits for the Wood-Ridge retirees, CW insists that it should be held to have accomplished the same result in "one step rather than two." We are unpersuaded.
 
 
 37
 CW's alternative theory will simply not fit the facts of this case. The record is devoid of any evidence that anyone at CW, much less a body having authority to terminate the plan, gave any consideration whatever to the business, public relations, tax or other legal implications of doing so. Moreover, after the announcement, no one at CW treated it as effecting a termination of the plan. No notice of plan termination was sent to all of the plan's participants, for example, as would have been required by ERISA if CW had intended to terminate it. 29 U.S.C. Sec. 1024(b)(1). Most important, it is incumbent on us to look at the economic reality of transactions involving a ERISA plans. To characterize the November 1983 announcement as a termination of CW's welfare benefit plan would be to ignore the reality of the matter. That announcement was nothing more than an application to the Wood-Ridge plant of the 1982 plan amendment, an amendment that CW regarded as only a "clarification" of a continuing plan.
 
 
 38
 We are confident that the drafters of Sec. 402(b)(3) would view the situation before us as one involving an attempted amendment to the plan in 1982, an amendment that could be effected only in a manner consistent with the requirements of that section. We are not disposed to indulge in a legal fiction in order to sanction an end run around the safeguards Congress there imposed.
 
 III. PLAINTIFFS' CROSS-APPEAL
 A. Reservation of Right to Amend
 
 39
 Turning to the cross-appeal, plaintiffs argue that the district court erred in concluding that CW reserved the right to amend its plan. They note that the district court, in so concluding, relied heavily on the reservation language contained in the Plan Constitution. Plaintiffs then stress that the Constitution, by its terms, facially refers only to "employees," not retirees. They further point out that one of CW's witnesses gave testimony susceptible of an interpretation that the Constitution was understood not to apply to the Blue Cross hospitalization program. Thus, according to the plaintiffs, the district court's conclusion about CW's reservation of a right to amend is without record support.
 
 
 40
 The district court understandably declined to hold that the Constitution and other plan documents were unambiguous as a matter of law. It held a trial in order to put itself in a position to consider all available evidence bearing on the sponsor's intent, the participants' reasonable understanding, and the past practice of the parties. Having considered all of this evidence, the district court made a finding of fact, in accordance with the teachings of Alexander v. Primerica Holdings, Inc., 967 F.2d 90 (3d Cir.1992), on whether the power to amend had been reserved. We may not disturb that finding unless, viewed in the context of all of the evidence, it is clearly erroneous. We decline to so characterize it.
 
 
 41
 First, while it is true that the Constitution does not specifically refer to retired employees, there is ample support for the district court's understanding of that document. On its face, the Constitution refers only to employees. It defines employees as individuals who are "intended to be employed for one thousand or more hours in a calendar year or a period of twelve months from an employee's date of hire." According to CW and its witnesses, the employee definition was meant only to distinguish between full-time and part-time employees and was understood to include those employees who had retired from full-time employment. Moreover, such an intent is reflected in several contemporary documents and is confirmed by the practice of the parties in the administration of the plan. Indeed, it was stipulated by the parties that retiree benefits were provided and administered in accordance with the framework established by the Constitution. Finally, CW's witnesses testified that when retirees asked to see plan documents they would be shown the Constitution as well as other documents.
 
 
 42
 Moreover, while the district court relied upon the Constitution, it relied as well on the clear and express reservation of the right to amend contained in every SPD following 1979 and in the summary of exempt retiree benefits first distributed in 1973 and revised in 1975.
 
 B. Right to Lifetime Benefits
 
 43
 Plaintiffs acknowledge that the vesting requirements of ERISA do not apply to retiree health benefits. They correctly point out, however, that a sponsor can voluntarily create vested retiree health benefits, and they insist that CW did so. More particularly, they "contend that the Court below erred in failing to recognize that the documents in this case, when considered in light of all the surrounding evidence, created a non-terminable right to receive retiree health insurance benefits for so long as Curtiss-Wright Corporation maintains a post-retirement health insurance program." Plaintiffs' Reply Brief, p. 7. It is apparent from the plaintiffs' brief that they regard this argument as being independent of the preceding argument that the court erred in finding a reserved right to amend. It seems to us, however, that our conclusion in the preceding section is a complete answer to this argument. Even if the plan contained unambiguous assurances that all retirees would have health insurance benefits for life so long as CW maintained a post-retirement health insurance program, the general reserved right to amend the terms of the plan in whole or in part would render the right of any retiree or group of retirees terminable by the adoption of a legally effective amendment.[6]
 
 
 44
 As we understand plaintiffs' briefs, they seek to avoid the effect of the court's finding of a reserved right to amend by implying that a general right to amend somehow does not authorize an amendment like the one CW purported to adopt in 1983. They explain:
 
 
 45
 ... the Court's determination that the Curtiss-Wright Post-retirement health insurance program was amendable did not address the issue of whether a general right to amend the Plan in whole or in part included a right to alter the classes of participants to eliminate benefits for some but not all participants based on a criteria that had never before been set forth as a determinative factor, i.e. whether the plant where someone last worked was still a functioning plant or had been closed.
 
 
 46
 Plaintiffs' Reply Brief, pp. 7-8.
 
 
 47
 While the court may not have expressly addressed this issue, it is apparent from the court's opinion that it properly decided it in CW's favor. One important and proper purpose of reserving a general right to amend is to permit the conditioning or cessation of any participants' benefits not vested by virtue of the mandate of ERISA in ways not originally foreseen in order to meet unanticipated changes of circumstance.[7]
 
 IV. CONCLUSION
 
 48
 The judgment of the district court will be affirmed.
 
 SUR PETITION FOR REHEARING
 March 14, 1994
 
 49
 Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ROTH, and LEWIS, Circuit Judges.
 
 
 50
 The petition for rehearing filed by appellant in the above-entitled case having been submitted to all the available circuit judges of the circuit in regular active service, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 
 [1]
 A number of witnesses, principally members of the plaintiff class, testified that they had been told, usually at their hiring or upon their retirement, that retiree health benefits would continue for life. CW witnesses disputed this
 
 
 [2]
 We exercise appellate jurisdiction over this case pursuant to 28 U.S.C. Sec. 1291. The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. Sec. 1331 and 29 U.S.C. Sec. 1132(f)
 
 
 [3]
 Even if we were willing to equate "by the Company" with "by the board of directors," the record here does not indicate that the 1983 amendment was adopted by CW's board. While Judge Roth agrees with our conclusion that the amendment to the plan was ineffective, she does not agree with our reasoning on this point. Instead, Judge Roth believes that action taken by "the Company" means action taken by the board of directors or whomever of the company has the authority to take such action under the corporation law of the state of incorporation of the company in question. As CW is a Delaware corporation, Judge Roth would consider action by "the Company" to be action by the board of directors pursuant to 8 Del.C. Sec. 141(a): "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation." Thus the amendment in question here was ineffective because neither CW's board nor any other person or entity within CW with the power to act on behalf of "the Company" ratified it
 
 
 [4]
 CW argues that the "amendment procedure" (i.e. modification by the Company) was effectively complied with since agents of the company added the amendment in writing to the plan. It notes that this was not an informal or unwritten plan amendment of the type invalidated in cases like Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155 (3d Cir.1990). In addition, the Company's intent to amend was clear, unlike in Frank v. Colt Industries, Inc., 910 F.2d 90 (3d Cir.1990). Nevertheless, while a written amendment incorporated into the plan's terms and a clear intent to amend may be necessary conditions to a successful amendment, they are not sufficient. ERISA Sec. 402(b)(3) requires that a plan specify amendment procedures and those procedures must be complied with. While written incorporation of a new plan term into the preexisting plan documents may be necessary for employees to understand their rights vis-a-vis the new term, it is also important that employees understand how their rights may be modified in the future; this latter goal can only be accomplished if there are published, enforceable amendment procedures
 
 
 [5]
 Our holding here should not be construed to extend beyond a situation in which a plan sponsor amends the plan in a fashion which is advantageous to the sponsor's interest and in which the beneficiaries of the plan later challenge that amendment. We do not attempt to encompass in this decision other factual scenarios under which an amendment might be challenged
 
 
 [6]
 Contrary to plaintiffs' suggestion, this case is unlike Alexander v. Primerica Holdings, Inc., 967 F.2d 90 (3d Cir.1992). The issue in that case was whether the arguably limited right of amendment reserved in that Plan was broad enough to authorize the amendment that the sponsor had adopted. Here, the right found by the district court to have been reserved was a general right to amend "in whole or in part, any or all provisions of the Plan." App. 547-48
 
 
 [7]
 Plaintiffs' reliance on 29 U.S.C. Sec. 1022(b) is therefore misplaced. Although SPDs, under the requirements of that section, must state the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," they cannot state specific circumstances that are not part of the plan's terms but could hypothetically be added to the plan in the future through a valid amendment. 29 U.S.C. Sec. 1022(b). On a similar note, at oral argument plaintiffs relied on our recent decisions in Fisher v. Philadelphia Elec. Co., 994 F.2d 130 (3d Cir.1993) and Kurz v. Philadelphia Elec. Co., 994 F.2d 136 (3d Cir.1993). These cases are, however, distinguishable. There, a material issue of fact existed as to whether agents of the plan administrator had made affirmative misrepresentations to plan participants, i.e., telling them that the company was not considering an early retirement plan when in fact it was. However, we cautioned that "ERISA does not impose a 'duty of clairvoyance' on fiduciaries" and that "[a]n ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan." Fisher, 994 F.2d at 135